**Madeline BIANCA, Administratrix of the Estate of Margaret Charlotta Young, Deceased, Plaintiff-Appellant,**

v.

**PARKE–DAVIS PHARMACEUTICAL DIVISION OF WARNER–LAMBERT CO., Dr. George Moss, Leonard S. Pickle, d/b/a Pickle's Rexall Drugs, and Does 1–15, Defendants-Appellees.**

No. 83–4108
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Jan. 23, 1984.

Roland Lewis, Robert Brantley, Jackson, Miss., for plaintiff-appellant.

Varner Parker & Sessums, David M. Sessums, Vicksburg, Miss., for Dr. George Moss.

Upshaw & Ladner, Heber A. Ladner, Jr., Jackson, Miss., for Parke-Davis.

Daniel, Coker, Horton & Bell, Roger C. Clapp, Donald V. Burch, J. Price Coleman, Jackson, Miss., for L.S. Pickle.

Before BROWN, TATE and HIGGIN-BOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

We are called upon to determine when the citizenship of an administratrix is properly disregarded under 28 U.S.C. § 1359[1] in a putative diversity case. We hold that an administratrix's citizenship will govern the diversity inquiry unless the administratrix was named with the motive of creating diversity where it would not otherwise exist. Because no such finding was made in this case, we reverse the district court's judgment dismissing this action for want of jurisdiction.

This lawsuit stems from the death of eleven year old Margaret Charlotta Young, who contracted aplastic anemia after taking a cold medication prescribed for her by defendant Moss and supplied her by defendant Pickle. Margaret Charlotta Young was a resident of Mississippi, as are her parents and as are Moss and Pickle.

Margaret's parents hired attorneys to sue Moss, Pickle, and Parke-Davis, maker of the drug. The trauma of losing their daughter, however, left them psychologically unable to deal with the many reminders of the tragedy encountered in the course of preparing the suit, and Mr. and Mrs. Young ultimately resolved that they would either have to find an administrator to manage the suit in their place or forgo suing at all. Of their many relatives and acquaintances, Mr. and Mrs. Young believed that only Mrs. Young's sister, Madeline Bianca, a resident of a nearby town in Louisiana, had sufficient ties to the family to be named administratrix of Margaret's estate. Accordingly, Bianca was named administratrix by order of the Mississippi Chancery Court.

Bianca, as administratrix, then filed this wrongful death suit against Moss, Pickle, and Parke-Davis in the United States District Court. Moss and Pickle, in answering the complaint, asserted a lack of jurisdiction because Bianca had been improperly named under § 1359 and her citizenship consequently could not be used to support diversity. The district court determined that because Bianca had no stake in the outcome of the wrongful death action and had been appointed administratrix for the sole purpose of bringing this suit, she was a "straw fiduciary." The diversity inquiry would accordingly look to the citizenship of the beneficiaries of the wrongful death action, Margaret's parents, who as Mississippi residents are not diverse as to defendants Moss and Pickle. The district court concluded that it lacked jurisdiction to try this suit, and granted the defendants' motion to dismiss.

We begin our review of § 1359 jurisprudence with the Third Circuit's durable opinion in *McSparran v. Weist,* 402 F.2d 867 (3d Cir.1968) (en banc), *cert. denied,* 395 U.S. 903, 89 S.Ct. 1739, 23 L.Ed.2d 217 (1969). The court dealt there with a growing practice of naming out-of-state administrators and guardians as a means of gaining access to the federal courts whose awards were notably more generous than those of the Pennsylvania state courts. The *McSparran* court rejected old decisions holding § 1359 applicable only when the administrator or guardian was not properly appointed under state law, and ruled that "a nominal party designated simply for the purpose of creating diversity of citizenship, who has no real or substantial interest in the dispute or controversy, is improperly or collusively named." *Id.* at 873.

In *McSparran,* the parties candidly admitted that the guardian had been named for the sole purpose of manufacturing diversity; there were no ties to the family, the guardian's sole function was to lend his name to the tort action, and the estate contained no assets save the tort claim. Though the guardian was unquestionably the "real party in interest" under state law, the court held that federal jurisdiction could not rest on so formalistic a base. Rather, the substantive considerations of

1. Section 1359 provides: "A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court." For an excellent discussion of the case law applying § 1359, see C. Wright, Law of Federal Courts § 31 (4th ed. 1983).

motive and function would guide the inquiry:

> While, of course, the desire to obtain diversity jurisdiction is not in itself improper, nevertheless it is not irrelevant in the determination of the question whether the fiduciary is in fact a straw fiduciary whose citizenship is to be disregarded. Moreover, it is difficult to see how motive can be entirely ignored in ascertaining the purpose for which the representative is selected in view of the language of § 1359.... [T]he artificial selection of a straw representative who has no duty or function except to offer the use of his citizenship to create diversity in contemplated litigation is a violation of [§ 1359's] provisions.

*Id.* at 874–75.

The *McSparran* rule found support the following year in the Supreme Court's decision in *Kramer v. Caribbean Mills, Inc.,* 394 U.S. 823, 89 S.Ct. 1487, 23 L.Ed.2d 9 (1969). *Kramer* involved the collusive—though valid under state law—assignment of a legal claim for purposes of creating jurisdiction in the federal courts, and the Court held that such conduct fell within § 1359's proscription. Though the Court recognized that there are some differences between assignment cases and guardianship or administration cases, and explicitly reserved the question of § 1359's role in the latter types of cases, *id.* at 828 n. 9, 89 S.Ct. at 1490 n. 9, *Kramer* has been consistently read as marking an end to the period in which citizenship of the formal "real party in interest" under state law was necessarily regarded for purposes of the diversity determination. Such a ruling, the Court noted, does not disparage the states' sovereign power to give effect to certain assignments and appointments made under their laws, but establishes only that "[t]he existence of federal jurisdiction is a matter of federal, not state, law." *Id.* at 829, 89 S.Ct. at 1490.

Bouyed by the *Kramer* decision, the "motive/function" rule of *McSparran* was quickly adopted in many other circuits. *See, e.g., Lester v. McFaddon,* 415 F.2d 1101 (4th Cir.1969); *O'Brien v. AVCO Corp.,* 425 F.2d 1030 (2d Cir.1969). This court adopted that rule in *Bass v. Texas Power & Light Co.,* 432 F.2d 763 (5th Cir.1970), *cert. denied,* 401 U.S. 975, 91 S.Ct. 1194, 28 L.Ed.2d 324 (1971), where the parties admitted that an administrator had been named for the sole purpose of creating diversity, and we accordingly dismissed the action for want of jurisdiction. The admission of improper motive made *Bass* an easy case, but we recognized there that ordinarily "[t]he question of whether a device is so lacking in substance as to be improper and collusive under Section 1359 is a question of fact." *Id.* at 766–67.

Such a factual determination had to be made almost immediately thereafter in *Green v. Hale,* 433 F.2d 324, 325 (5th Cir. 1970), where there was no admission that the out-of-state administrator had been named deliberately to create diversity. We held that under such circumstances, "inquiry into the purpose of the appointment is essential," *id.* at 329, thus reaffirming that the motive underlying the naming of an out-of-state administrator is a determinative factor under § 1359. Factors to be considered by the district court in making a § 1359 inquiry include:

> the relationship of the representative to the party represented; the scope of the representative's powers and duties; any special capacity or experience which the representative may possess with respect to the purpose of his appointment; whether there exists a nondiverse individual who might more normally be expected to represent the interests at stake; whether those seeking the appointment of the representative express any particular reasons for selecting an out-of-state person; and whether, apart from the appointment of an out-of-state representative, the suit is one wholly local in nature.

*Id.* at 329; *accord, Groh v. Brooks,* 421 F.2d 589, 595 (3d Cir.1970).

Hard on the heels of *Bass* and *Green,* we decided *White v. Lee Marine Corp.,* 434 F.2d 1096 (5th Cir.1970), wherein the motive underlying the appointment of an out-of-state administrator was hotly contested, but we

affirmed as not clearly erroneous the trial court's determination that the administrator had been improperly or collusively named in contravention of § 1359. The inquiry, we stated, was "(1) whether there was an intent to manufacture diversity, and (2) whether there is sufficient substance to the appointment to allow it to be recognized in a diversity suit." *Id.* at 1098–99. Our inquiry into the substance of the appointment was spurred by *McSparran's* "heavy emphasis on its finding that the guardian there was only a straw party with no stake in the outcome of the litigation and no fiduciary relationship to the parties represented." *Id.* at 1098. Thus, we perceived a "requirement of substantive as well as formal validity of the representative's appointment." *Id.*

This language, regretably, has since been misconstrued to imply that we require an administrator to have some substantial stake in the outcome of the wrongful death action he brings for the estate, even in those cases where the administrator's appointment is not infected by any improper motive to manufacture diversity. *Bishop v. Hendricks,* 495 F.2d 289, 294 n. 23 (4th Cir.), *cert. denied,* 419 U.S. 1056, 95 S.Ct. 639, 42 L.Ed.2d 653 (1974). We do not think *White* may be so read. First, *White* relies on *McSparran* as the source of its analysis, and *McSparran* does not suggest that a "substantial stake" test must be passed above and beyond the "proper motive" test. Rather, *McSparran* relies in part on the guardian's lack of a stake in the litigation to establish that there was no proper motive for the appointment of this individual.[2] Second, in reviewing the district court's dismissal of the action in *White,* we analyzed the various indicators of proper and improper motive in the appointment. As there was no indication that the administrator had any stake in the outcome of the litiga-

tion, this review would have been pointless if there was a separate "substantial stake" requirement. Moreover, if one examines the district court finding under review— "that the said [administrator] has no real or substantial interest in this litigation; and that said appointment was improperly or collusively made to invoke the jurisdiction of this Court," *id.* at 1100—it is apparent that the only inference which might fairly be drawn from *White* is that, where an administrator does have a substantial stake in the litigation, jurisdiction will be sustained even if there is evidence that this administrator was chosen for the purpose of creating diversity.[3] Third, to the extent *White* may be ambiguous, it must be read in light of *Green v. Hale,* where the emphasis was plainly on motive alone.

■ The Fourth Circuit in *Bishop* also took note of our observation in *White,* repeated in *Kenebrew v. Columbia Land & Timber Co.,* 454 F.2d 1146 (5th Cir.1972), that upholding federal jurisdiction where the administrator has no stake in the litigation and no substantial ties to the beneficiaries, "would not advance any of the functions diversity jurisdiction was designed to serve." *White,* 434 F.2d at 1100; *Kenebrew,* 454 F.2d at 1147; *Bishop,* 495 F.2d at 295 n. 29. By that statement, however, we meant only that we could not find any affirmative reason to uphold jurisdiction, not that failure to advance the functions of diversity jurisdiction itself inveighs against jurisdiction where statutory requirements are otherwise met. Control over the scope of diversity jurisdiction rests with Congress, and we may not bar a plaintiff—with or without a "substantial stake" in the litigation—from access to the federal courts because we conclude that he is unlikely to encounter any bias in state court against out-of-state plaintiffs.[4]

---

**2.** All courts are in agreement that the administrator's statutory fee does not give him a "stake" in the estate's fortunes as that term is used in this context.

**3.** This *per se* rule was in fact adopted by the *Bishop* court, 495 F.2d at 293, and has also been adopted by the Tenth Circuit in *Hackney*

*v. Newman Memorial Hospital,* 621 F.2d 1069 (10th Cir.), *cert. denied,* 449 U.S. 982, 101 S.Ct. 397, 66 L.Ed.2d 244 (1980).

**4.** In *Bass,* 432 F.2d at 767, and *White,* 434 F.2d at 1099 n. 8, we commented approvingly on a proposal by the American Law Institute to use the citizenship of the decedent or the benefi-

In sum, we have for many years adhered to the rule that an administrator whose appointment is not motivated by an intent to manufacture diversity does not fall within the proscription of § 1359, and that the existence of diversity will accordingly be determined with reference to his citizenship. Whether the administrator has a substantial stake in the litigation, whether he has duties above and beyond prosecution of the lawsuit, and whether the estate contains assets other than the wrongful death claim may all inform our judgment as to the motive for the appointment, but none of these elements are independently necessary to sustain jurisdiction if no improper motive underlies the appointment.

In *Bishop v. Hendricks,* the Fourth Circuit abandoned this "motive" test in favor of a "substantial stake" test. The court held that an out-of-state administrator who is named for the purpose of prosecuting a lawsuit but has no substantial stake in the outcome of that suit has been improperly or collusively named under § 1359 even if there is no evidence that the manufacture of diversity was a motive for the appointment. The administrator must have "something more than a nominal interest at stake in the litigation," *id.* at 297:

> [A]ny appointment of an out-of-state administrator, which is nominal and "without substance" and which, if given effect for jurisdictional purposes, has the effect of giving diversity to an action which does not "really and substantially involve a dispute or controversy" between citizens of different states, is violative of the purposes of, and falls under the interdict of, Section 1359.

*Id.* at 294.

Despite this rather absolute statement of the "substantial stake" test, the *Bishop* court allowed that this test would not apply where it could be shown that the administrator was not appointed predominantly for purposes of prosecuting the lawsuit. "It

may be assumed," the court stated, *id.* at 293, "that if there is a valid reason for the appointment of an out-of-state administrator that gives to his representation greater substantiality than a mere administrator *ad litem,* the citizenship of the administrator may be determinative of diversity." However, where the administrator has no material function other than prosecution of the lawsuit, and no stake in the outcome of that suit, § 1359 will be violated even if the administrator was named for perfectly legitimate reasons:

> [T]he fact that the beneficiaries are prostrated by grief, or are related to the out-of-state administrator, or are relying on the administrator for advice or that the out-of-state administrator is "a competent business man," will not justify diversity based on the administrator's citizenship. Confidence in the superior business judgment and ties of friendship, even intimate ones, are equally unavailing.... [O]nly if the Court can conclude that the out-of-state administrator has something more than a nominal relationship to the litigation will the citizenship of an out-of-state administrator sustain diversity, and any reason or motive for the appointment which does not elevate his relationship to the litigation above the level of a nominal party is irrelevant to the issues of diversity.

*Id.* at 295. The "function" aspect of the Fourth Circuit's rule is evidently designed to ameliorate some of the harshness of a strict "substantial stake" test, and harmonizes with the "function" branch of the traditional "motive" test—though in the latter case the existence of functions other than prosecution of a lawsuit simply evidences the presence of proper motives for the administrator's selection.

The question before us is whether we should join the Fourth Circuit in adopting a "substantial stake" test or retain the old "motive" test.[5] We see much in the Fourth

---

ciary rather than the administrator or the guardian for purposes of determining diversity. Though this rule may better effectuate the purposes of diversity jurisdiction than the present

rule, that policy determination is for Congress to make.

**5.** The Seventh Circuit has endorsed the *Bishop* rule in *Betar v. De Havilland Aircraft of Cana-*

Circuit's approach that is attractive. The "substantial stake" test is simple to apply, and averts the "difficult and perhaps needless litigation of disputed facts [which] might well encourage perjury or manipulation of factual evidence," *White,* 434 F.2d at 1099 n. 8, that attends the "motive" test. The "substantial stake" test may also do more to effectuate the purposes of diversity jurisdiction than the "motive" test. Nevertheless, we recognized in *White, id.,* that we are not free to adopt a desirable rule if it is not the rule prescribed by statute.

■ We conclude that the "substantial stake" test cannot be justified under the language of § 1359. The statutory interdict against jurisdiction where a party "has been improperly or collusively made or joined *to invoke* the jurisdiction" of the federal courts (emphasis added) incontrovertably suggests to us that the motive underlying the naming of the administrator must guide the diversity inquiry. If an out-of-state administrator has not been selected with the purpose of manufacturing diversity, the administrator's lack of a stake in the outcome of the litigation cannot alone trigger § 1359's jurisdictional bar.

Returning to the facts of this case, it is apparent that Bianca has no substantial stake in the outcome of the wrongful death action. Though Bianca asserts that Mississippi's Wrongful Death Statute vests in her substantive powers and duties which belie any claim that she is a "straw fiduciary," she does not lay claim to any portion of any

recovery in the wrongful death action, and she does not credibly claim that her function as administratrix was to do more than prosecute this lawsuit.[6] On this basis, the district court found that Bianca was a "straw-party" whose citizenship would be disregarded in the diversity inquiry.

The district court cited our holdings in *Green v. Hale* and *Kenebrew v. Columbia Land & Timber Co.,* but we find no support in these cases for a *per se* rule against parties having no stake in the litigation, absent some improper motive in the administratrix's appointment. Principally, the district court relied on the Fourth Circuit's decision in *Bishop v. Hendricks,* but we decline to follow the principles there enunciated, and accordingly we cannot uphold a § 1359 inquiry which is grounded in the *Bishop* standard. Though the district court did find an attempt to manufacture diversity, the court made plain its view that an attempt to manufacture diversity is presented when the administratrix has no function other than prosecution of the lawsuit and no stake in the outcome of the suit, irrespective of the fact that the administratrix is named in good faith.

■ We hold, in sum, that § 1359 instructs us to disregard the citizenship of an administratrix only when there is a factual determination that the administratrix was named with a purpose to manufacture diversity.[7] The district court thoughtfully traversed this uncertain terrain but because it chose a path we here make plain was not

da, Ltd., 603 F.2d 30, 35–36 (7th Cir.1979), *cert. denied,* 444 U.S. 1098, 100 S.Ct. 1064, 62 L.Ed.2d 785 (1980). The Sixth Circuit, however, has recently rejected the Fourth Circuit's approach, *Gross v. Hougland,* 712 F.2d 1034, 1039 n. 10 (6th Cir.1983), noting that the wording of § 1359 "indicate[s] the type of manufacture or joinder that the statute governs: joinder or manufacture for the purpose of invoking the court's jurisdiction."

**6.** Nevertheless, Bianca may be correct in suggesting that the state laws governing wrongful death actions and estate administration can influence the diversity inquiry under the Fourth Circuit's formulation, thus returning to pre-*McSparran* days when diversity was dependent on the application of state law. In light of the

Supreme Court's observation in *Kramer,* 394 U.S. at 829, 89 S.Ct. at 1490, that "[t]he existence of federal jurisdiction is a matter of federal, not state, law," this circumstance provides an additional rationale for rejection of the Fourth Circuit test.

**7.** Because that question is not presented here, we will not decide whether diversity jurisdiction should be upheld when the administratrix is named with a purpose to create diversity but does have a stake in the litigation or substantial functions and duties beyond prosecution of the wrongful death action. We can see some virtue in a *per se* rule favoring jurisdiction under such circumstances, and, as mentioned in note 3 *supra,* that rule has been adopted in the Fourth and Tenth Circuits.

available in this circuit, we must reverse the dismissal of this suit for want of jurisdiction. On remand the district court's inquiry will be guided by the circumstance that its ultimate inquiry is into motive and purpose with substantiality of stake a relevant but not controlling indicator as we here explain.

REVERSED and REMANDED.